UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )
v.                             )      CRIMINAL ACTION NO.
                               )      10-10275-DPW
JOSE BAEZ,                     )
                               )
              Defendant.       )
                               )


MEMORANDUM AND ORDER
July 16, 2012

     The question presented is whether evidence gathered through

a technique authorized by a number of Courts of Appeals – other

than the First Circuit which had not addressed the issue – should

be suppressed in this arson case because the Supreme Court held

the technique violative of the Fourth Amendment well after the

evidentiary initiative used here was completed.  I conclude that

the exclusionary remedy is not appropriate in these circumstances

and will consequently deny the defendant's motion to suppress.

     Defendant Jose Baez has moved to suppress the fruits of a

number of searches and seizures which federal agents conducted on

the basis of evidence gathered, without a warrant, by monitoring

his movements through GPS tracking devices.  After the GPS

monitoring in this case was concluded, the Supreme Court in

*United States* v. *Jones*, 132 S. Ct. 945 (2012) declined to join a

clear majority among those Courts of Appeals that had addressed

the question and held the technique was a search within the scope

of the meaning of the Fourth Amendment for which a warrant was

required.  Nevertheless, applying the teachings of *Davis* v. *United States*, 131 S. Ct. 2419 (2011), I decline to suppress the evidence gathered through that technique in this case because the purposes of the exclusionary rule would not be served.  Where, as here, law enforcement officers at the time they act have a good faith basis to rely upon a substantial consensus among precedential courts, suppression of probative evidence is too high a price to pay because of the subsequent supervention of that consensus by the Supreme Court.

## I.  FACTS

As will appear below, the evidentiary meat of the government's case against Baez is marbled with elements derived from GPS monitoring which give the case significant texture, taste, and cohesion.[1]  To understand the case in full, an extended review of the facts is necessary.  The parties largely agree on the facts, which I recite below.

A.   The Fires Prompting Investigation

Early in the morning on April 29, 2009, firefighters responded to a fire at Jamaica Plain Auto Body in Jamaica Plain, Boston, Massachusetts.  Investigators determined that the fire was the result of arson that originated in front of the garage bay doors where piles of burnt tires and clothing were found.

---

[1] I note, however, that the government stated at a hearing on the motion to suppress that it was prepared to try the case with or without the evidence obtained from the GPS monitoring.

Surveillance camera footage showed that an older-model, dark Chevrolet Caprice with silver trim, a light-colored steering wheel cover, and a silver emblem on the driver's-side C-pillar[2] of the vehicle drove onto the road leading to the auto shop moments before the fire began.

On July 31, 2009, firefighters responded to a fire in a brownstone condominium complex in Kenmore Square, Boston, Massachusetts. The complex contained a dentist's office, Back Bay Dental, as well as condominiums. Firefighters found burned tires and clothes, and detected the odor of gasoline, in the building's front vestibule. A witness told officers that he had seen a light-skinned man with dark hair and medium build run away from the building moments before the fire and drive away in a dark-colored mid-sized sedan. Surveillance cameras recorded an older-model, dark-colored Chevrolet Caprice with silver trim travel in the alley next to the building just before the fire.

B.   ATF Agents Suspect Baez

Based on the surveillance tapes from both locations, agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") determined that the vehicle was a Chevrolet Caprice manufactured between 1986 and 1989. After obtaining a list from the Massachusetts Registry of Motor Vehicles of the thirty-eight

_____

[2]  The C-pillar on a car is the part of the car running from either side of the roof to the trunk, separating the rear doors from the rear windshield.

3

dark-colored Chevrolet Caprices manufactured during that time
period that were registered to addresses in the Boston area, ATF
officers located and observed each vehicle to see if it had the
distinctive characteristics observed in the surveillance tapes,
including the silver trim, light-colored steering wheel, and
silver emblem located on the driver's-side C-pillar.

Agent Brian Oppedisano of the ATF observed that a Chevrolet
Caprice belonging to Baez, unlike most of the other vehicles
reviewed, matched the distinguishing characteristics of the
vehicle in the surveillance tapes.

Agent Oppedisano cross-checked the list of dark-colored
Chevrolet Caprices with the list of patients at Back Bay Dental.
Baez was the only owner of a Chevrolet Caprice in the proper
color and model-year who was also a patient at Back Bay Dental.
Back Bay Dental's office manager remembered Baez because in
September 2008, he had his veneers re-cemented and he became
angry when he needed them re-cemented again in June 2009.  The
office manager recalled that in June, Baez was argumentative, and
repeatedly threatened that he would not pay for the re-cementing.

Baez had also been a customer of Jamaica Plains Auto Body,
which had been set on fire in April.  Agent Oppedisano talked to
the owner and operator of the body shop and with his permission
searched the business's records.  The owner of the shop noted
that a customer later determined to be Baez had come to the shop

in the summer of 2008 to fix a water leak in the trunk of his older, black, vinyl-roofed Chevrolet Impala. Baez was not satisfied with the quality of the work, and demanded his money back. The owner refused and Baez became upset, later filing a claim in small claims court. Baez lost his case; the owner of the body shop provided Agent Oppedisano with a copy of the small claims court's judgment, dated September 18, 2008.

C.   GPS Tracking

On August 27, 2009, Agent Oppedisano attached a GPS device to Baez's Chevrolet Caprice while it was parked on a public road in front of his apartment. The GPS device sent Agent Oppedisano a text message any time the vehicle traveled outside of a perimeter around Baez's residence.[3]

From January 2010 until August 2010, Baez's Chevrolet Caprice traveled outside of the perimeter of Baez's house on twenty-six days. During the last week before Baez was arrested for arson, however, Baez traveled outside of the perimeter on six out of seven days.

On August 9, 2010, at 3:21 a.m. (roughly the same time when the April and July fires were reported), the GPS device attached to Baez's car reported that it had left the perimeter. Agent

---

[3] Beginning on January 8, 2010, Agent Oppedisano also tracked another of Baez's cars, an Acura MDX, in case Baez was using that vehicle to scout out locations for arsons. By April 22, 2010, Agent Oppedisano did not believe that Baez was using the other vehicle for such purposes, and the device was removed.

Oppedisano received a text message alerting him to Baez's movement. By logging on to a website, Agent Oppedisano was able to determine that the GPS device was stopped near 5 Bexley Road in Roslindale, where it remained for approximately seventeen minutes. Because this was an unusual break from Baez's travel patterns, and matched the timeline of the previous arsons, Agent Oppedisano alerted law enforcement personnel regarding Baez's movements and directed officers to the area.

At approximately the same time, a fire was reported at 11 Firth Road in Roslindale. Firth Road runs parallel to Bexley Road. The structure at 11 Firth Road was a two-and-a-half story home, occupied both by tenants and the owner. Investigators determined that the fire originated on the front porch of the home, where a strong odor of gasoline was detected. Trained arson canines detected ignitable liquids around the area of the fire's origin, which investigators determined to be an arson. Two of the residents of 11 Firth Road were asked if they knew Baez. After being shown a photo array, they identified Baez as a man who had sold them tickets in the Dominican lottery.

Boston Police Detective James Freeman located Baez in his vehicle in front of his residence a few minutes after the fire was reported. As Detective Freeman approached, Baez lowered his driver's side window, and Freeman smelled a strong odor of gasoline coming from the interior of the Caprice. Freeman

arrested Baez, read him his Miranda rights, and took him into custody.

Officers searched Baez and found a box of matches in his pocket.  During a later interview, Baez claimed that the matches were in his pocket because he was a smoker.  Officers report that during all of the searches they subsequently performed, no cigarettes were ever found.

Officers later discovered that surveillance cameras near Baez's residence showed him leaving his home shortly before the Firth Road fire.  Traffic cameras from Columbia Road (the road in front of Baez's residence) showed Baez's Chevrolet Caprice driving in the direction of the Firth Road fire at 3:20 a.m.

D.   Subsequent Searches

Later on August 9, officers executed search warrants on Baez's Chevrolet Caprice and his apartment.  Officers found Poland Springs bottles which contained residue of gasoline in the Caprice's trunk, and traces of gasoline were found on the vehicle's passenger-side floor carpeting and on the driver's seat.  Baez's residence contained matches found in a towel, computers, notebooks, maps and an index card linking him to the Whole Foods grocery store in the Fresh Pond area of Cambridge that had been the victim of arson in December 2008.  An ATF agent at the scene remembered that the Whole Foods arson involved a wick made of clothing with a laundry stamp of "Baez" on it.

On August 13, 2010, officers executed a search warrant at a garage in West Roxbury that was rented to Baez.  Agent Oppedisano knew of the garage because the GPS on Baez's Caprice had been stationary in front of the garage for a period of time two days before the Firth Road fire.  Officers found tires, plastic containers with gasoline residue, and other materials associated with arson.  They also found a Whole Foods apron, and a shirt with laundry tags with "Baez" on them like the shirt used as a wick in the Whole Foods arson.  On September 16, police conducted a search with Baez's consent of another garage he rented in Jamaica Plain.  There, officers located gas containers and tires consistent with the arsons.

## II.  PROCEDURAL POSTURE

Following his indictment, Baez moved to suppress all of the evidence both directly from and indirectly a result of Agent Oppedisano's use of GPS tracking devices on Baez's two vehicles. With the agreement of the parties, I decided to await the Supreme Court's decision in a pending case, *United States* v. *Jones*, before ruling on the motion to suppress.  In its decision on the merits in *Jones*, the Supreme Court held earlier this year that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" for purposes of the Fourth Amendment.  132 S. Ct. 945, 949 (2012).  As a result, I directed

8

the parties to file supplemental briefs on the effect of *Davis* v.
*United States*, 131 S. Ct. 2419 (2011) on *Jones* as applied to this
case and conducted a motion to suppress hearing limited to the
issue whether, in light of *Davis*, suppression would be a proper
remedy here.

### III. DISCUSSION

Baez argues that as a result of *Jones*, the GPS search of
his vehicles and any fruits of the search that officers obtained
by tracking his Chevrolet Caprice for 347 days must be
suppressed.  I do not find suppression on the basis of *Jones*
self-executing because *Davis* counsels the exclusionary rule
should not be applied if the evidence was gathered at a time when
the Courts of Appeals approved the practice at issue and there
was no controlling precedent to the contrary within the relevant
circuit.

A.  The Fourth Amendment Landscape In Which The Baez
    Investigation Proceeded

Officers conducted the warrantless GPS tracking of Baez's
vehicles at a time when there was unanimous support for its
validity in the face of Fourth Amendment challenge.  For almost
the entirety of the time officers were tracking Baez with the GPS
device, the three Circuit Courts that had expressly addressed the
issue had unanimously concluded that police did not implicate the
Fourth Amendment warrant requirement by monitoring a GPS tracking

device on a car in public. *United States* v. *Marquez*, 605 F.3d
604, 609-10 (8th Cir. 2010); *United States* v. *Pineda-Moreno*, 591
F.3d 1212, 1216-17 (9th Cir. 2010); *United States* v. *Garcia*, 474
F.3d 994, 997-98 (7th Cir. 2007); *see also United States* v.
*Michael*, 645 F.2d 252 (5th Cir. 1981) (upholding tracking with a
beeper attached to a vehicle).

    As it happens, the ATF agents stopped using the GPS tracking
device on Baez's car, and arrested Baez, just three days after
the D.C. Circuit's opinion in *United States* v. *Maynard*, 615 F.3d
544 (2010), was issued creating a minority holding in the Courts
of Appeals that GPS tracking was a search and thus evidencing a
circuit split on the issue. And, even after *Maynard*, my
colleague Judge Young joined the majority of the Circuits in
holding that GPS tracking was not an unreasonable search under
the Fourth Amendment. *United States* v. *Sparks*, 750 F. Supp. 2d
384, 394-96 (D. Mass. 2010). Given the vast weight of authority-
--albeit not formally binding in the First Circuit---permitting
warrantless GPS monitoring until *Jones* was handed down, it is
apparent the Baez investigators were acting in good faith when
they made use of that technique.

B.   *Davis* v. *United States* and the Exclusionary Remedy

    In *Davis*, police officers arrested the defendant for driving
under the influence and placed him in the back of a patrol car.
Officers then searched the passenger compartment of the vehicle

Davis was driving, and found a handgun inside Davis's jacket pocket. 131 S. Ct. at 2425. Davis was charged and convicted of possession of a firearm by a convicted felon. *Id.* at 2425-26. Two years later, while Davis's case was on appeal, the Supreme Court decided *Arizona* v. *Gant*, 556 U.S. 1230 (2009), which held that the automobile search-incident-to-arrest exception to the warrant requirement only applies when either the arrestee is within reaching distance of the vehicle or officers have reason to believe that the vehicle contains evidence of the crime for which the individual was arrested. Following *Gant*, the Eleventh Circuit held on appeal that officers violated Davis's Fourth Amendment rights by searching his vehicle without a warrant. *Davis*, 131 S. Ct. at 2426. The Eleventh Circuit, nevertheless, declined to apply the exclusionary rule, finding that its application would do nothing to deter future Fourth Amendment violations. The Supreme Court affirmed. *Id.* at 2434.

The Supreme Court in *Davis* began its analysis by noting that a long line of precedent has established that the exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations." *Id.* at 2426. Recognizing that "[e]xclusion exacts a heavy toll on both the judicial system and society at large," the Court described exclusion as a "'last resort'" that should only be used when "the deterrence benefits of suppression . . . outweigh its heavy costs." *Id.* at 2427 (citations omitted).

11

Citing the development of the doctrine since *United States* v. *Leon*, 468 U.S. 897 (1984), and the "basic insight of the *Leon* line of cases," the Supreme Court recognized that its caselaw had established an inverse relationship between the culpability of law enforcement conduct and the deterrence benefits of exclusion:

> When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, or when their conduct involves only simple, "isolated" negligence, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way."

*Davis*, 131 S. Ct. at 2427-28 (citations omitted). The Court noted that "in 27 years of practice under *Leon*'s good-faith exception, we have 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." *Id.* at 2429 (citation omitted).

The Court then held that the evidence found in Davis's vehicle should not be excluded. Application of the exclusionary rule would not further its purpose of deterring officers from violating the Fourth Amendment, the Court found, because the officers were acting in strict compliance with then-binding precedent in the Eleventh Circuit and "their behavior was not wrongful." *Id.* Indeed, the facts of *Davis* were nearly identical to a then-binding Eleventh Circuit case which held that a

12

substantially contemporaneous search of an arrestee's vehicle did

not implicate the Fourth Amendment.[4]

---

[4] The *Davis* majority also rejected the dissent's concern that
the decision (applying the good-faith exception to the
exclusionary rule) conflicted with the law of retroactivity.
*Davis* v. *United States*, 131 S. Ct. 2419 at 2430-31 (2011). The
doctrine of retroactivity provides that a Supreme Court decision
"construing the Fourth Amendment is to be applied retroactively
to all convictions that were not yet final at the time the
decision was rendered." *United States* v. *Johnson*, 457 U.S. 537,
562 (1982). Even those decisions that constitute a "clear break"
from past precedent apply retroactively. *Griffith* v. *Kentucky*,
479 U.S. 314, 328 (1987).
    The majority drew a distinction between the doctrine of
retroactivity and the question of the appropriate remedy for a
Fourth Amendment violation. *See Davis*, 131 S. Ct. at 2431
(noting that "retroactive application of a new rule of
substantive Fourth Amendment law *raises* the question whether a
suppression remedy applies; it does not answer that question").
To answer the question of what is the appropriate remedy, the
majority held that a court should determine whether exceptions to
the exclusionary rule, such as the good-faith exception, should
apply in the case at hand.
    Justice Breyer in dissent contended that this distinction is
"highly artificial and runs counter to precedent. To determine
that a new rule is retroactive *is* to determine that, at least in
the normal case, there is a remedy." *Id.* at 2437. *See also*
*Danforth* v. *Minnesota*, 552 U.S. 264, 271 (2008) ("What we are
actually determining when we assess the 'retroactivity' of a new
rule is not the temporal scope of a newly announced right, but
whether a violation of the right that occurred prior to the
announcement of the new rule will entitle a criminal defendant to
the relief sought."). The majority opinion, Justice Breyer
contended, changed the default rule---that exceptions to the
exclusionary rule on good-faith grounds were limited to
extraordinary circumstances---to "'a categorical bar to obtaining
redress' in *every* case pending when a precedent is overturned."
*Davis*, 131 S. Ct. at 2437.
    Justice Breyer thus expressed grave concern over the
continued viability of the exclusionary rule: "[i]f the Court
means what it now says, if it would place determinative weight
upon the culpability of an individual officer's conduct, and if
it would apply the exclusionary rule only where a Fourth
Amendment violation was 'deliberate, reckless, or grossly
negligent,' then the 'good faith' exception will swallow the

<u>C.</u>   <u>Applying *Davis*</u>

Baez argues that *Davis* should be limited to its precise holding.  That is, Baez proposes that *Davis* be read only to prevent suppression where officers face *binding* appellate precedent that is subsequently overturned.

This interpretation is entirely too static an approach to a considered Supreme Court opinion.  It is apparent that both the majority opinion and the concurring and dissenting opinions anticipated the principles of *Davis* would be worked out in subsequent cases raising themes and variations.

In her concurrence Justice Sotomayor carefully noted that the *Davis* opinion left unresolved what the proper remedy should be "when the governing law is unsettled."  131 S. Ct. at 2436 (Sotomayor, J., concurring).  For his part, Justice Breyer, who was joined in dissent by Justice Ginsberg, predicted that development of *Davis* would affect "a very large number of cases," *id.* at 2440 and, as a result, "similarly situated defendants" would be treated differently. For present purposes, the issue before me is what to do in a case that has not reached final judgment when the relevant Fourth Amendment law has been changed after the questioned activity is completed, and consequently law enforcement cannot conform their investigation to the new standard.

---

exclusionary rule."  *Id.* at 2439.

While it might be accurate to describe the overall range of
Fourth Amendment issues as a sunburst of doctrine, the immediate
implications of *Davis* for *Jones* in the circuits are arrayed along
a rather narrow spectrum.  These range from Circuits in which
there was binding precedent on the GPS issue before the Supreme
Court handed down *Jones*, to those Circuits with no binding
precedent governing the issue before the Supreme Court
established it in *Jones*.  This spectrum can be refined further by
plotting a time dimension that identifies when the issue first
became unsettled as a result of *Maynard* and when it was resettled
by the Supreme Court for all courts in *Jones*.  It should be
emphasized that binding precedent, in the absence of a Supreme
Court decision on a point of law, is established in the federal
system by the United States Circuit Courts of Appeal.  While
perhaps persuasive, decisions of the federal district courts are
not binding on any parties other than those in the case
generating that particular decision.[5]  Similarly the decisions of
state courts on federal Fourth Amendment law are not binding in
the federal courts, or on federal law enforcement agents, except
perhaps when their work is considered directly by state courts
themselves.[6]

---

[5] *Cf. Vertex Surgical, Inc.* v. *Paradigm Biodevices, Inc.*, 648 F.
Supp. 2d 226, 231 (D. Mass. 2009).

[6] *Cf. Elkins* v. *United States*, 364 U.S. 206, 223–24 (1960) ("In
determining whether there has been an unreasonable search and

And even binding precedent within a particular circuit does
not require the United States to acquiesce in the application of
that precedent in other circuits. *See generally United States* v.
*Mendoza,* 464 U.S. 159 (1984); *United State* v. *Plat 20, Lot 17*,
960 F.2d 200, 211 (1st Cir. 1992) (citing *Georgia Dep't of Med.*
*Assistance* v. *Bowen*, 846 F.2d 708, 710 (11th Cir. 1988) and
*Railway Labor Execs. Ass'n* v. *I.C.C.*, 784 F.2d 959, 964 (9th Cir,
1986)). The government may challenge a decision in one circuit
by litigation in other circuits until the Supreme Court has
spoken definitively, *cf.* Samuel Estreicher & Richard Reves*,*
*Nonacquiescence By Federal Administrative Agencies*, 98 Yale L.J.
679 (1989), as it ultimately did in *Jones*.

The majority opinion in *Davis* effectively accepted that
there would be differential application of newly announced
Supreme Court precedent among law enforcement agents operating
within the several circuits. Under the *Davis* rubric, the
exclusionary remedy in *Jones* turns on compliance with precedent
governing within each circuit at the time the challenged law
enforcement initiative was undertaken. In the aftermath of *Jones*,
district courts in those circuits where GPS monitoring of varying

---

seizure by state officers, a federal court must make an
independent inquiry, whether or not there has been such an
inquiry by a state court, and irrespective of how any such
inquiry may have turned out. The text is one of federal law,
neither enlarged by what one state court may have countenanced,
nor diminished by what another may have colorably suppressed.")

types was authorized before the Supreme Court addressed the issue have chosen not to deploy the exclusionary remedy retroactively. *See, e.g.*, *United States* v. *Aquilar*, 2012 WL 1600276 (D. Idaho May 7, 2012.); *United States* v. *Amaya,* 2012 WL 1188456, at *5-8 (N.D. Iowa April 10, 2012) (separate part of opinion dealing with personal sanctions withdrawn upon reconsideration by 2012 WL 1523045 (N.D.Iowa, May 1, 2012)). And it goes without saying the law established in the D.C. Circuit by *Maynard*, requiring suppression, was left unaffected by *Jones*.

More problematic is the impact of *Jones* in jurisdictions which had no binding precedent before *Jones* was handed down. The one district court case I have found in a circuit - the Third - without binding precedent before the Supreme Court decided *Jones*, *United States* v. *Katzin*, 2012 WL 1646894 (E.D. Pa. May 9, 2012), applied the exclusionary remedy to suppress evidence gathered from a GPS initiative after the split among the circuits had been established as a result of the D.C. Circuit's decision in *United States* v. *Maynard*, 615 F.3d 544 (D.C. Cir. 2010). The case before me is distinguishable from *Katzin* in that *Maynard*, which created the circuit split, was not handed down until three days before the use of GPS monitoring on Baez's car was concluded and cannot in any realistic sense be held to have been on the legal radar screen of the ATF agents employing the GPS device at issue here.

But *Katzin* frames the issue more broadly because it reflects
a view of the exclusionary remedy that I find unlikely to survive
the plain implications of *Davis*. *Katzin* warns against "mov[ing]
beyond the strict *Davis* holding [because] that can effectively
eviscerate the exclusionary remedy entirely." 2012 WL 1646894, at
*9. "If law enforcement is permitted to rely on authority from a
minority of other circuits,[7] to support the constitutionality
of its investigatory practices, where does a district court draw
the line when binding precedent later renders those practices
unconstitutional?" *Katzin* queries, *id.* Relying, *id.* at *10, on
*United States* v. *Johnson*, 457 U.S. 537, 561 (1982) and its
discussion of the exclusionary rule before the full development
of good faith exceptions to that remedy reflected in the *Leon*
line of cases, *Katzin* declined to "open[ ] to the Government the
shelter of the good faith exception in this case [because it]
would encourage law enforcement to beg forgiveness rather than

---

[7] In describing the authority as from a "minority of other
circuits", *Katzin* rather argumentatively characterizes the pre-
*Jones* state of circuit case law. *Katzin* describes the state of
the law as one in which "there were four circuit courts of
appeals that arguably could have supported [the use of GPS
devices] and one that would not have, *meaning that fewer than
half of the circuits had even weighed in on the question*," while
noting that the Third "Circuit was in the 'silent majority' on
the issue." *United States* v. *Katzin*, 2012 WL 1646894, at *9 &
n.14 (E.D. Pa. May 9, 2012) (emphasis supplied). I am of the view
that when the 4 out of 5 circuits identified in *Katzin* as
rendering considered opinions have reached the same conclusion -
irrespective of whether a simple majority of circuits have not
had occasion to address the issue - the state of the developed
law may properly be termed a substantial consensus.

ask permission in ambiguous situations involving the basic civil rights." *Id.*

*Katzin's* vivid allusion to evisceration suggests that the exclusionary rule is some living entity rather than an inanimate instrument available to be deployed as necessary and when appropriate to serve enforcement of Fourth Amendment guarantees. The choice of metaphor is telling in this context. The deployment of an instrumentality is properly governed by a cost-benefit analysis rather than concern for imputed bodily injury to an otherwise disembodied prophylactic rule. The Supreme Court in *Davis* was engaged in just such a cost-benefit analysis and effectively directed lower courts to do likewise in the developing case law.

Professor Tracey Maclin and, Jennifer Rader, his student coauthor at Boston University Law School, have plausibly argued that the *Davis* cost-benefit exercise is part of a larger doctrinal project. "The rationale of *Davis* confirms that the Court intends to limit application of the rule to deliberate, bad-faith or recurring Fourth Amendment violations." Tracey Maclin & Jennifer Rader, *No More Chipping Away: The Roberts Court Uses An Axe To Take Out The Fourth Amendment Exclusionary Rule*, 81 MISS. L. REV. 1183, 1190 (2012). Whether the *Davis* rationale will lead to broader limitations on the Fourth Amendment exclusionary rule remains to be seen. Plainly *Davis* governs in

the context of evaluating retrospective exclusionary sanctions for failing to anticipate newly developed Fourth Amendment substantive law, as happened with the law enforcement officers in this case.  And as daunting as may be the challenge, it is the lot of the lower federal courts to provide the initial plotting for the lines of demarcation regarding the deployment of the exclusionary rule while the Supreme Court continues surveying the territory.

Meanwhile, careful analysis of the issues is not advanced by rhetorically casting good faith reliance on a substantial consensus of precedential authority as "beg[ging] for forgiveness".  At least since 1984, when *Leon* was decided, the Supreme Court has shown itself fully prepared to find good faith reliance adequately justifies law enforcement action even when that reliance is later found to have been misplaced.  This is the contemporary approach not merely in the evaluation of motions to suppress on Fourth Amendment grounds, but also with respect to the qualified immunity afforded law enforcement officers in civil actions raising claims of unconstitutional misconduct more generally.  *Cf. Reichle* v. *Howards*, 132 S. Ct. 2088 (2012) (holding that alleged First Amendment right to be free from retaliatory arrest when arrest is otherwise supported by probable cause not clearly established at time of plaintiff's arrest, even

when precedential decision in Circuit whose law governed could be read to suggest otherwise).

A rigorous and realistic cost-benefit analysis recognizes that there is no meaningful deterrence value to be gained – and a great deal of benefit in terms of truth seeking and public safety to be lost – by discouraging such good faith reliance and thereby making law enforcement officers unduly cautious in pursuing investigatory initiatives. To be sure, a different approach might be chosen in which law enforcement agents take no steps – without asking permission of a court – regarding the myriad circumstances in which there is no precedential case on point. Such a regime seems unnecessarily unwieldy – and potentially ennervating to timely police action in other settings – when, as here, a substantial consensus among precedential courts provides a good faith basis for the investigatory initiative law enforcement agents seek to pursue.

### III. CONCLUSION

There being no sufficient benefit for the cost of suppressing probative evidence of arson developed through the use of GPS devices without a warrant in this case, I deny the Defendant's motion (Dkt. No. 42) to suppress.


**/s/ Douglas P. Woodlock**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT